May it please the Court, my name is Tom Zeelman. I'm attorney for the Appellant and Cross Appellee. In this case, the Accommodation, I'd like to reserve two minutes for rebuttal and five minutes for argument by the United States, the Plaintiff in this case, on the Cross Appeal. Can I just ask one preliminary question? What is the exact role of the United States in this case? The United States is acting on behalf of the Treaty Tribes in this case regarding the Treaty Tribes management, co-management of the fisheries on the Columbia River with the states of Oregon and Washington. But they don't really take a position on the dispositive issue that we have to decide, do they? I mean, I suppose we could ask counsel for the government. The United States has briefed this issue and is supporting the Accommodation's right to fish under Article III off-reservation treaty rights at Icicle Creek. But the real question that you're presenting to us is who has the priority over the fish, right? Well, the question in this case is what was intended by the 1894 agreement. And in this case, we have a statute that was passed by Congress that is completely silent on the issue of whether the Wenatchees have any rights at all. Right. And that's the issue. And is also silent on the issue of whether the Accommodation relinquished any, all of its rights, including any Article III off-reservation rights at Icicle Creek. But they're not, the government's not taking any position on the argument inter sese between the two tribes. The Accommodation, well, the government is supporting the Accommodation's position. I don't want to burn up all your time. We'll pursue with the government what its position is. Go ahead. Well, anyway, Your Honor, three years ago this court ruled, over three years ago this court ruled that the issue of the fishing rights alleged by the Wenatchee Colvilles at Icicle Creek was not barred by res judicata. Therefore, we ended up in trial in the court below. And it turns out that the Wenatchee Colvilles were able to produce no evidence that there were any understandings by the negotiators, the Ackamas at the time in 1894, that they were ever going to grant any rights to the Wenatchee Colvilles. There were certain representations and promise, representations made by the government. There were representations made. And they were documented in the findings of fact by the district court. That's correct, Your Honor, but it's not clear. Where did the district court go wrong? The district court went wrong by concluding that the understanding of the Ackamas was that they were going to be somehow allowing the Wenatchees to have these rights there. At the time that this was negotiated, and this has already been established by the U.S. Supreme Court, the rights that the Wenatchees held there were not treaty rights. So whatever rights that the Wenatchee Colvilles had at that time were only under state law. They were not rights that were Article III rights under the Ackama Treaty. And I think that's kind of forgotten in this case is the fact that these treaty right issues have already been established. And to say that the government is coming in and saying, well, we're going to protect whatever rights you have, the rights that they had at the time were only to lawfully fish under state law. There were no treaty rights to protect at that time. And so to construe. Are you talking about which year are you talking about now? This is the Icicle Creek Fishery, which is. No, but which year? You said at that time. You were talking about 1894, were you not? Because there was no state in 1855. Well, yeah, I'm talking about in 1894, Your Honor. I forgot. At that time, 1889 was when the state of Washington was brought into the Union. So at the time that the treaty was signed in 1855, the Ackama Nation reserved those Article III rights. And the court found through trial back in 1994, and was upheld by this court, that the Wenatchee Band dissociated itself from the Ackama Nation and no longer had those rights. So in 1890, and that was before 1894. So whatever rights they could have had at that time that the government was allegedly protecting or preserving or the privileges that they're mentioning in the record in Executive Document 67. But, Mr. Zellman, it wasn't just the government. You've got Captain Anais, the Ackama representative. You've got Thomas Simpson. You've got Charlie Scummett, all of whom were Ackamas, each of whom said, essentially, you've got to let the Wenatchee people continue to live and fish there. Well, Your Honor. Isn't that part of the way that the Supreme Court says we're to interpret these treaty rights as by how the Indian representatives themselves expressed themselves? There's two issues there. One, the statements that were made by the Ackamas at the time only really concerned their ability to live there on those lands. There was no mention of the fishery. Not by any of those. But how can you square that with the instructions from the Secretary of Interior to the Indian agent, which were repeated multiple times during the negotiations, that we were to preserve all of the extant rights of the tribes? Well, again, I go back to what rights are we talking about? You don't deny that the Wenatchee can legitimately claim Aboriginal fishing rights to this particular fishery, do you? I mean, to the beginning of recorded history, they fished there. That's correct, but they didn't reserve those through treaty. They were reserved. Well, don't we look to the contemporaneous statements of the negotiators for the United States, even though it may not have been contained in the written words of the treaty, in order to conclude that the preservation of their right to fish in their usual and accustomed place was protected by the United States? No, Your Honor. The issue of whether they had rights to fish at a usual and accustomed place was decided by this court. And it was decided that it was no. So whatever rights they had there that they were allegedly protecting was the ability to fish from those lands that they were giving there, okay, but fishing under state law. And they were not barred from fishing under state law. They were just able to fish under state law. That's the only understanding they could have had, because this court has already decided that those rights were not Article III treaty rights. So whatever rights they had at that time, the United States may have had some intent to protect, but they were not of the same equivalence as treaty rights. And that sort of came out of thin air when the judge came out with this decision in the court below. He said, well, the Yakimas understood that they would have the same character as treaty rights. There's absolutely no evidence in the record that that's true whatsoever. What is the standard of review here, counsel? We've got the district courts to take on this. How do we review his decision? It should be de novo review, mainly because it's an issue of mixed law and facts. Oh, no, wait. Wait a second.  That's correct, Your Honor. So he tells the historical facts. He finds those. These are the historical facts. And then he, from those historical facts, he draws some legal conclusions. Correct? That's correct. All right. So the way I read your position is you don't really dispute the historical facts. The evidence that was presented was we would conclude was correct. But the conclusions that came out of those findings. Your dispute are the legal conclusions that he draws. That's correct. That's correct, which should be under de novo review. Right. So the legal conclusions are subject to de novo review by us. That's correct. And the key thing to understand here is. So my question to you, I should have been more specific the last time, which specific legal conclusion do you challenge? We are challenging the legal conclusion that there is evidence in the record that the, well. Now, see, now you just said there's evidence. I'm asking. Okay. So the legal. Legal. So, you know, so did he misinterpret the treaty? Did he misinterpret the agreement in 1894? What? There's three legal issues here. Okay. One is that there is, the plain language was ignored in the statute, first of all. And even assuming that there was an ambiguity in the statute, which there doesn't appear to be. I mean, there's nothing in there that says. Statute or treaty? The 1894 agreement. Agreement. The agreement that they made. Right. There's nothing in the statute that says anything about granting Wenatchee's any rights. It talks about. But why can't we look beyond the treaty under the Supreme Court authority that we have to interpret the treaty in the context of all of the surrounding circumstances as the Indians would have understood them? And how can you take that position where Agent Irwin repeatedly assured everybody present at the 1893 negotiations that they shall have the right to fish at the, I'll probably butcher the pronunciation, but the Wenatchepam fishery? But it wasn't clear what rights they were talking about. What's unclear about that statement? That's as clear as clear water to me. It wasn't clear whether they were talking about Yakima's or Wenatchee's. It wasn't clear whether they were talking about treaty rights or rights simply to fish there. If I recall from reading this, you may correct me if I'm wrong, but I thought there was something like break in the council meeting at the time and they were going to go back to the council and obviously the Wenatchee's were going to go back. And the statement was made in that context. The context of continuing negotiations? Yes, and that the Wenatchee's were going to get some fishing rights would be protected. I thought that's what was in there. I may be wrong. I read this a while ago. My recollection these days, my short-term memory is not good these days. Here's the ultimate legal issue in this instance. Assuming that these are ambiguous, both factual issues and the construction of the statute, the 1894 agreement has to be construed, as you said, to the benefit of the Indians in the way they understood it at the time. The problem here is, and this is what the Wenatchee Calvos are forgetting, is that the Yakamas were the ones that signed this agreement. And if there's any construction in favor of the Indians, it has to be to the benefit of the Yakama nation who signed the agreement. But are you forgetting, and I should say this advisedly, the way the American government treated Indians generally for much of our history is so terrible that we have to look at the whole context here to try to bring common sense to it because they brought in these people that were self-serving, self-healing, drawing boundaries that were far different than the places that anybody thought you were going to have in the first place. And the Supreme Court under the Choctaw case makes it very clear that we have to look at these treaties in the way the Indians themselves would have understood it. And as has been pointed out by all of us here, both the government agent Irwin and people from the Yakama nation made it very clear in 1894, as far as they were concerned, that the Wenatchee had the right to live and fish where they'd lived and fished before. Now I understand that if we were in the State Department and we were dealing with some particular modern situation, we'd have a whole bunch of lawyers around, and all the lawyers would do all these wonderful things, screw up the whole world. But that's what we've got now is that we've got this ancient treaty, but ironically pretty significant actual testimony taken down at the time. We have to look at that, do we not? It's not as technically nice as it might be, but will we have to take that into consideration? Your Honor, we're not asking for a hyper-technical interpretation here, but we are looking at extremely scant evidence of what was intended at the time. And when you look at extremely scant evidence like that, obviously there's an ambiguity when only the United States is speaking of these things, not the Indians themselves. You have to construe it to the benefit of whoever is actually signing the agreement. There were statements made by the Yakama elders that basically were protective of their Wenatchee brothers, that they were concerned that whatever the deal was that the government was going to make with the Yakama, that it had to be approved by the Wenatchee. And there's a strong suggestion in the record that Indian agent Irwin was perhaps less than completely forthright in the manner in which he dealt with the Wenatchee. Why is this any different from the cases that the Supreme Court has decided with regard, for example, to the Iowa tribe land claims, where they ultimately went back and directed additional compensation be paid to the Iowas because they had not been decently treated in comparison with how other tribes were treated when they moved off their lands onto reservations? Your Honor, the only evidence in the record that we can point to is that the Yakamas were concerned about the Wenatchee's keeping their land. Now, whether or not there's an implied fishing right attached to that was decided by the court when he decided on page 26 of his ruling, and the court's ruling saying that when they have allotments, there's no implied fishing right there. These were allotments, these were not reservations that they were talking about. Will you just give me a common-sense explanation of the actual impact if the district court's decree and judgment is carried out? Say we uphold it. What is the impact on the Yakama Nation and the Wenatchee? How do they deal with one another? What are their rights with respect to fishing and for the Wenatchee to where they live? Right now it's not clear just what the regulatory authorities are respectively. Assuming that the court affirms these decisions, the court below is going to have to make some findings and we're going to have to talk about just what the respective regulatory authorities are. But that's where the United States would come in, is it not? Or would it be the state of Washington? The states. So the state of Washington presumably would deal with this just like it would anybody else that had fishing rights. They would allocate in whatever method is done for everybody. Well, we don't know. The Yakamas and the state of Washington are co-managers of the resource, but we don't know what the relative position of the Caldwells and Wenatchees are going to be relative to. Right, and that's yet to be determined if we uphold this, right? That's correct. Why don't we hear from the government? Please, the court. Robert Lundman representing the United States. I'd like to start with describing the issue the United States is addressing here and why we're only weighing in on that one issue because that's what the court started with. We're only addressing the issue here of whether in 1894 that agreement stripped the Yakamas treaty right under Article III to fish the usual and custom places, including at this fishery, the Wenatchum fishery. And we're only addressing that argument here, that issue, because this is a fine line. Why were you so focused just on this one issue? It seems like you have an interest in the main fundamental issue, which is whether the Wenatchees have any rights at all. That's what I can describe it. And if there's an agreement with the government. Right. There are a few conflicting kind of rules of thumb the government applies in these sorts of cases. One is the United States tries to stay out of disputes between tribes. And this is a classic dispute between tribes. Except for the government had a big hand in crafting this agreement. That's right. I mean, the agreement signed by the government and the Yakama. Or stated another way, in causing the problem initially. We would never suggest the government stop this problem. I was just curious. I mean, I don't want to take your opinion. I think it's a fair question. And there's a general rule that we don't try to stay out of these sorts of disputes. The other rule is, and this is what prompted the filing of this case back in 1968, is to validate the treaty right that was at stake here. And that, most specifically, is the Article III right to fish at the usual and custom places. And the argument we are making here is the district court got it right on that issue, that here the 1894 agreement does not mention Article III. It does not mention the right to fish at the usual and custom places. And just on a plain reading of the 1894 agreement, there's no stripping of that right of the Yakama in Article III of the 1855 treaty. But why isn't this the same situation as the Supreme Court addressed? I can't remember whether it was in the Mililac tribe or the Menominee, where the observation was that subsistence hunting and fishing rights was so fundamental to the very existence of these peoples that when we were talking about moving them to reservations and compensating them for land, nobody was thinking about their fishing rights. Everybody just assumed that they would be entitled to continue. That's exactly right. And that's the position we take here with respect to the hunting and fishing rights, the Article III right to fish at the usual and custom places of the Yakama. Why is the government not being more protective of the rights of all of the tribes to fish at this particular fishery? Well, the scale of the weighing here with that issue is one that's really a dispute between the two tribes about what the 1894 agreement grants to the Wenatchee. But you're really backing the Wenatchee with what you just said, are you not? Well, I was responding to you in the context of the argument. No, I understand that. But the reality is, aren't you backing the Wenatchee? If you're acknowledging what Judge Tallman just said about the fundamental nature of a right to fish for the people that lived there in that time, that's how they fed themselves, basically. That was, in essence, a key part of their lives. If you're agreeing that that was just so fundamental, so understood, that everybody got it, that you had a right to fish, that's the point that the Wenatchee are making in part, right? That's clearly the point that they're making in part. The Yakima are claiming that that's the right that belongs to them, and we're not weighing in on it. We're agreeing it's a fundamental right, but we're not weighing in on who has that right or doesn't, except for the 1855 treaty, Article 3. You agree the government created the problem, but you're saying you wish it would go away and be nice now, right? Well, I think at times the government created these problems, and arguably the 1894 agreement is such an example by inserting itself where it should not have. You don't still have anybody in the Department of Justice that helped negotiate this 1894 treaty, do you? Not that I know of. Happened right before I started. I'm sorry, but would you address Judge Smith's earlier question about, suppose, assume for a moment that we affirm the judgment. Right. What happens next? Well, I don't think that's clear. There's very little record on that. I think there's a paragraph or two in the district court opinion about what occurred in 2007, that both tribes fished there. So many fish were caught. There were so many surplus fish that were divided between the two tribes. So that's as much as we know about what's occurred in the record as far as I know. The problem with this resource is that we can't assume that in 2010 or in any further fishing season that the fish will be as abundant as apparently they were in 2007. So this issue is going to fester unless it gets resolved. I think that's right. The district court here specifically said it was not deciding the issue of where the assuming, let's assume the district court's opinion is affirmed completely as it is. The district court said, I'm not deciding where the Wenatchee share of fish comes out of. Does it come out of the Yakima share or does it come out of the state share? And so that issue has not been decided, not been briefed, and isn't before this court. So I think if the district court opinion was affirmed as is, those things would be on the table still to be decided. Now the flip side is maybe the tribes would work out a deal amongst themselves. The district court hints to that. Right. And from the United States' perspective, this fishing isn't occurring on the national land at the hatchery, and that's where it's taking place. We have a very good mediation service with the court. Have the tribes considered utilizing that by chance? I was not involved in the case during the mediation period in this court. Well, Judge Kleinfeld may have been right. This litigation is becoming like jar and dice versus jar and dice. It is a long-running litigation. One reason the United States is weighed in here is this issue about whether the Article III right to fish, set forth in the 1855 treaty at the U.S. General Customs Places, is the very issue the United States described in its complaint that it filed in 1968. So it's not that we're far afield and way down the road into some other briar patch. The court decided in 1974, but here we are in 2010, and we're still wrestling with these issues. No, I agree it's still a long-running case and still going on. Thank you. Thank you. We'll hear from Mr. Good morning. Donald Simon for the Colville Tribes on behalf of the Wenatchee Tribes. Mr. Simon, yes, good morning. There's actually one proposition that all the parties before you agree on, and it's foreshadowed by many of the questions, which is the proposition that treaties with Indian tribes and agreements and statutes that confirm agreements with Indian tribes are to be construed based on the understanding of the Indians at the time the treaty was negotiated, based on the understanding of the tribal representatives at the negotiating council. Well, the Yakamas could understand it one way and the Wenatchee could understand it another way. That's right. How did that principle help us here? Well, that's the inquiry made by the district court, and the district court conducted an extensive review of the historical record, including the actual source documents underlying the 1894 agreement, heard from multiple experts, considered additional hundreds of historical exhibits submitted by those experts, and took testimony from 22 witnesses. Based on that search and consideration, the district court made findings about the understanding. But I'd like to ask you the question I ask opposing counsel. What is the standard of review that we apply to the factual determinations of the district court? I'm not talking about any legal errors the court may have made, but as far as the factual determination, what do we have, an abusive discretion standard, a clear error standard? What do we got? It's a very deferential standard to the district court findings. What is it? Abusive discretion? What is it? I think the language I recall is that if the findings of the district court are plausible based on the evidence. That is clearly, unless they're clearly erroneous. Clearly erroneous. Clearly erroneous. Is that the standard? Yeah. It's a very deferential standard. The Millax case and the fishing vessel case both make this point clear, that it's the understanding of the Indians, that's the operative interpretive rule. In Millax, the Court said a court is to look beyond the written words to the larger context of the history of the agreement, the negotiation and the practical construction by the party. These are principles this Court recently affirmed in the United States v. Smithskin when it made the same point, that it's the tribe's understanding at the time of the agreement that's relevant. Now, there's a sense in which the crux of the issue here is that the Yakima of today are trying to impose their preferences and their beliefs on what their ancestors thought and believed 120 years ago. And the two are very different. The Yakima of today are trying to deprive the Wenatchee tribe of any right of access whatsoever to their own ancestral fishery, their aboriginal fishery at Wenatchepam, while the Yakima of 120 years ago were motivated primarily by a desire to protect and safeguard the interests of the Wenatchee in their homeland. But even if that's true, and I accept that as a characterization based on my review of the record, we have a problem in that the Wenatchee never signed the treaty and they disassociated themselves from the Yakima after 1855. And it wasn't until the government pressed them to move to the Colville that they left their aboriginal grounds. Well, the Wenatchee did sign the 1855 treaty. They were signatories to the treaty. Well, through the Yakima, right? No, they were. Oh, I'm sorry, you're right. You're right. They were at the 1855 treaty council. They did sign that treaty. Now, in this Court's 1994 decision, the Court found that the Wenatchee, because they did not move to the Yakima reservation, lost political cohesion with the treaty tribe. But in this Court's 2006 decision, the race judicata decision, the Court noted that the Wenatchee remained at this Wenatchepam fishery reservation and fished there this is the time right after the 1855 treaty, fished there during this time firmly believing that a survey would be made and they would be secure in this reservation. In other words, the 1855 treaty created this special Article 10 reservation for the Wenatchee at Wenatchepam. They weren't supposed to move to the main Yakima reservation. They stayed there. They expected the government to survey and set aside the reservation for them at Wenatchepam, and the government failed to do so. So are you saying that in light of that fact we can distinguish the holding of our panel in 1994 that essentially, as I read it, said because they failed to move to the reservation, they can no longer claim rights under the 1855 treaty? The truth is that I think the 1994 panel got the history wrong. But what do we do about that? Are we going to have to go and bank on this issue? No. We accept as law of the case the finding of the 1994 decision. But as the Court indicated in the 2006 decision, there is a distinct new question about whether the 1894 agreement conferred, itself conferred, a fishing right on the Wenatchee tribe at the Wenatchepam fishery. So we are not seeking the 1855 treaty right, which the 1994 panel held the Wenatchees had lost. This is a new and distinct right, and that's the whole thing. But your whole claim just turns on the 1894 agreement. That's correct. That's all we're focusing on. And the counsel's argument was that really all the Wenatchee got out of that was the land. That's what he said. Yes. And it didn't carry with it the fishing right. Yes. So what do you say to that? Well, I think that's a very crabbed reading of the history. I also think it's contrary to the findings of the district court about what was going on during the negotiation. When you read the session, and we're very fortunate in this case to have an actual transcript of the session counsel. We have the exact words of the Yakima leaders. It is for the government to treat these Wenatchee Indians right. That's what Captain Enius, the Yakima leader, told the federal agents. The Yakimas at that session counsel were saying, this isn't our land over there. You go talk to those Wenatchees about it. You see, we want to hear what they have to say, and then we'll respond to the government. Running throughout the session negotiation is a palpable concern by the Yakimas for the interest of the Wenatchees at this fishery because they knew that this fishery is the Wenatchee homeland. And I think it's just, it kind of beggars reality to assume that the Yakimas were not concerned for the fishing rights of the Wenatchee at their aboriginal fishery. That's particularly true in light of the fact that the government agents were repeatedly telling the Yakimas and the Wenatchee that the Wenatchee fishing rights would be protected. All right. Wasn't there some representation that their rights would be protected, that the Wenatchee would have the lawful use of the fisheries in common with the white people? Yes, yes. And that's a directive that comes from the Secretary of Interior. The Secretary of Interior writes a letter to the Commissioner of Indian Affairs telling him to negotiate a session of this Article 10 reservation, and in that letter says, protect the fishing rights of the Indians in the neighborhood of this reservation. The Commissioner of Indian Affairs then transmits those instructions to the local federal agents who are negotiating the session agreement. So we have this unbroken chain from the Secretary of Interior down to the local federal agents saying that it is the position and intent of the United States specifically to protect the fishing rights of the local Indians, the Wenatchees, at this fishery. And the district court made findings of fact that are, I think, correctly framed and well supported by this historical record. The court said the events leading up to the 1894 agreement and the negotiations themselves demonstrate that Yakima tribal members were concerned about protecting the Wenatchee right to the fishery, and that's based on the historical evidence considered by the district court. The session council itself took place at the Yakima reservation, which was 150 miles away from the Wenatchee Pan fishery. And John Harmel, the Wenatchee leader, traveled in the middle of the winter over to the session council. There are a few points. To the first session, right? Excuse me? To the first session in December of 1893? The session council started in mid-December 1893. There were three meetings, and then they took a break, a two-week break. Right. And then the fourth and last day of the council was January 6, 1894. But he was not present for all sessions, was he? He left after the third meeting. He was not present for that fourth meeting two weeks later. But interestingly, even at the fourth meeting, when Harmel and the Wenatchees were not present, the Yakimas were still pressing the federal agents to protect the interests of the Wenatchees. And the government promised at that last meeting that it would protect the interests of the Wenatchees. The position of the government at the session council, I think, is quite clear based on the instructions given to the government agents. To protect the interests of the Wenatchees, their fishing privileges should be taken into consideration and protected. They are not to be deprived of the lawful use of the fisheries in common with the white people of the state. That in common phraseology echoes the treaty language, the Article III treaty language of the off-reservation fishing right. It's language that's used by the government to grant affirmative fishing rights to Indians. And that's what was promised to the Wenatchees. At the session council, the Yakima made repeatedly clear that the Wenatchepam fishery was a fishery of the Wenatchees. It was the Wenatchee homeland. One of the Yakimas told the federal agents, I'm not going over to my friend's house and throwing him off his place and tell him I would get rich and fat off his place. You talk to these Wenatchee Indians and ask them what they want for that land, but not the Yakimas. And as I understand the historical record, the government defaulted even on that obligation because they didn't establish all of the allotments that should have been established for the Wenatchees. Yes. I mean, in this court's 2006 opinion, it referred to the broken, unfulfilled promises that the government made to the Wenatchees. And the court was referring both to the 1855 treaty, where a reservation at Wenatchepam was set aside for the Wenatchees. Right. But then the government failed to... Until we figured out that the railroad ran through it. Yes. And there were a bunch of white settlers who had packed into the land. Yes. The government failed to take it out of the public domain, and white settlers moved in. So the government then said, okay, we'll buy the reservation back from the Indians, but we'll protect the interests of the Wenatchees. So at the session council, they tell John Harmel repeatedly, don't worry, we're going to give you land just where you want it. We'll give you this land. We'll try to put it all together so you have effectively a form of a reservation, and you'll be able to continue to fish. Okay. So your position is that at a minimum, we should enforce the promise that was made throughout, recognized by the Yakama, that the Wenatchee had fishing rights at this fishery. Yes. Okay. Yes. All right. Go ahead. My follow-up question is, the district court then addressed the primary right argument, and if you could address that as well, it would be helpful, because the historical record seems to suggest that the Wenatchee were very generous with their neighbors, particularly, I think, the Kittitas, in sharing that fishery. That's true. That's true. The primary right argument really is a kind of subsidiary argument to the major argument we make on that part of the case, which is that the 1894 agreement, in addition to making these promises to the Wenatchees, is a session of the Article 10 reservation by the Yakama. But it's a session not just of the reservation, it's also a session of all their right of fishery of whatsoever name of nature at this Article 10 reservation. So our position, which is asserted in a defense to the Yakamas seeking an injunction to borrow our fishing right, is that they ceded their fishing rights at this reservation, so there's no injury that entitles them to seek an injunction against our fishing there. Now, the district court held that this session language does not serve to relinquish the Yakamas' off-reservation fishing right under Article 3. Under Article 3. And that's the basis of our cross-appeal, and that's the issue on which the United States participated in this matter. Wasn't the district court correct in that rule? Well, we don't think so. Why not? Well, for two reasons. First, again, applying the fundamental canon of construction that applies to agreements and treaties like this, what was the understanding of the Indians at the time of the session council? We think it's clear that what the Yakama were saying is we don't have any interest in this fishery. This is the Wenatchee fishery. We're concerned about our fisheries by our reservation on the Columbia River. We're trying to hold those fisheries. And we think it's clear that what they intended and what they understood was that they were ceding all their rights at the Article 10 fishery. Now, you know, at the end of the session council, as the agreement was consummated, and once they reached agreement on a final price, one of the Yakamas said, we will relinquish all our rights to the Wenatchee Pan Fishery for $20,000, all our rights. And none of the other Yakama contested that or modified that or expressed any other understanding of that very straightforward language. So we think applying the canon of how did the Yakama understand this session, it was a session of all their fishing rights. In terms of the language of the session, it's very broad language. Let me interrupt you. Was the historical evidence before the district court that the Yakama, as distinct from the Wenatchee and perhaps the Kittitas and the Chelan and other tribes that are closer to the fishery, had not traditionally fished at that fishery? Well, there was evidence that some of the constituent tribes of the Yakama Nation, particularly the Kittitas, had fished at this location in pre-treaty times. There was relatively little evidence, just a couple of references to fishing by any Yakama around the time of the 1894 agreement in the 1880s and into the 1890s. In terms of the — And was that simply because of the distance that the tribes — I think so. This is a fishery. It's a fishery 150 miles away from the Yakama reservation. In terms of the language, I think what's important is that this is not just a session of the reservation land itself, but there are two distinct sessions in this language. It's a — they cede and relinquish all their right, title, interest, claim, and demand of whatsoever name or nature in and to all their right of fishery, as set forth in Article 10, and also all their right, title, interest, claim, or demand in and to said land, known as the Wenatchipan fishery. So there's a session of the reservation, and it's a distinct and separate session of the right of fishery. Now, the cases do hold, the Menominee case in particular, that when a tribe cedes reservation, it loses its exclusive on-reservation fishing right. But if there's a background off-reservation fishing right, it can exercise those rights on the ceded reservation land. But in those cases, there's no separate and additional session of the off-reservation fishing right. And here, there is a separate session of that fishing right. So we think the language, the very broad language in Article 1 of the 1894 agreement, ceding the land and fishing right, is consistent with the statement of how the Yakamas understood the session agreement. But the district court obviously didn't interpret Article 1 the same way you do. That's true. And let me say, on that, there really is a kind of textual dispute. I mean, the district court read language in the session agreement that said they ceded all their right of fishery as set forth in Article 10. And the district court said, well, that's a session just of their on-reservation right. We don't think that's the best reading of the law, and we don't, for the reasons I explained, we don't think that's a reading which comports with the Yakama understanding at the time. The reason it's not the best reading of the law is that the on-reservation fishing right is necessarily ceded with the relinquishment of the reservation itself. That's the holding of the Klamath case. So to say that only the on-reservation right is ceded gives no meaning whatsoever to the separate and distinct session of fishing rights. Further, Article 10 doesn't set forth any fishing rights. Article 10 creates this reservation and describes the location for it. So what Article 10 sets forth is a location, and in the session language which says we cede all right of fishery as set forth in Article 10, we believe the better reading is a session of all right of fishery at the location described in Article 10. That's our statutory interpretation. But, again, the basic principle here, the basic canon, is how did the Indians understand it? And we think the unifying theme throughout the session of counsel is the Yakama saying that's the Wenatchee homeland. That's the Wenatchee fishery. We're concerned with our fishery here. You take care of the Wenatchee and protect their interests. And we think all this fits together. In the remaining seconds I have, I just want to make one point with the Court's indulgence. Something that I think is very important to understand is that this site is the ancestral homeland of the Wenatchee. This tribe is trying to maintain a connection with its ancestors at this one site. This is the one Wenatchee fishing site. How many members are there of the Wenatchee tribe now? At Colville, there are 2,700 people who have Wenatchee ancestry. And the Yakamas are, of course, a much bigger tribe. The Yakama have over 10,000 people in the tribe. But this site has special significance to the Wenatchee. The Yakamas have fishing sites all over the state of Washington. This is a site of enormous spiritual and cultural significance to the Wenatchee. There was eloquent testimony at trial by members of the Wenatchee tribe about how they are raised and taught to have a connection with their ancestral fishery. That's what this case is about, to allow them to maintain that connection. Thank you very much. Thank you. You can have a minute for rebuttal if you'd like. Thank you. It's interesting that the Wenatchee Cabals are asking for a very technical interpretation of the 1894 agreement regarding the Yakama rights to fish there as opposed to the way the Indians understood it at the time. The truth is that the evidence in the record supports the Yakama's position that they were fairly silent about their off-reservation Article III rights to fish there. There was no mention of them whatsoever. And that's reflective in the- Counsel, on the assumption that Article X of the agreement had created a fishery that was located at the confluence of Icicle Creek and the Wenatchee River, and the Yakama sold their interest in that fishery and the reservation for $20,000, why shouldn't we conclude by entry into the 1894 agreement that they gave up all claim of fishing at that particular location? Well, number one, the statute does qualify as saying Article X, as set forth in Article X. But also it is, under the Bolt decision, if you do extinguish a reservation or diminish a reservation, that they become in common rights under Article III. And there was substantial evidence in the record that the Yakama's were fishing there from the time of the signing of the treaty through 1894 and well into the 1920s. And that was something that the court looked at and said, yes, those Yakama's were fishing there along with the Wenatchee's. So in order to have Congress abrogate a treaty right, it has to be explicit and there was no explicit language in there. Thank you. Thank you. We appreciate counsel's arguments in this case. All counsel is very interesting and very helpful. Thank you very much. We're recessed for today. Thank you.
judges: Paez, Tallman, Smith M.